**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. [___]**

| | |
|---|---|
| **ANTHONY SHNAYDERMAN**, *et al.*, on behalf of themselves and all others similarly situated,<br><br>    *Plaintiffs,*<br><br>*v.*<br><br>**OZONE NETWORKS, INC. (d/b/a OPENSEA),**<br><br>*Defendant.*<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **CLASS ACTION COMPLAINT**<br><br>    **JURY DEMAND** |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

*"…it's really again the wild-west and you have to be careful about how much you invest obviously…"*

*-Devin Finzer, OpenSea CEO[1]*



---

[1] https://www.youtube.com/watch?v=JhZnUQEg_b0 (accessed Sep. 19, 2024).

**INTRODUCTION**

Plaintiffs, Anthony Shnayderman and Itai Bronshtein, on behalf of themselves, and all others similarly situated, file this class action complaint against Defendant, Ozone Networks, Inc. (d/b/a OpenSea) ("OpenSea") for their offer and sale of non-fungible tokens ("NFTs"), which Plaintiffs will prove are each unregistered securities.  As Plaintiffs' Counsel have learned over the course of several years of extensively litigating similar crypto actions against sellers of unregistered securities *before this Court,* such as the Multi-District Litigation of *In re FTX Cryptocurrency Collapse Litigation*, *Karnas v. Mark Cuban*, and *Harper v. O'Neal*, certification of certain issues under Rule 23(c)(4), and possibly other sections of Rule 23 of the Federal Rules of Civil Procedure, such as whether the NFTs at issue ***are*** (and/or ***are not***) unregistered securities, is an efficient way to expeditiously and materially advance litigation of these common questions as a whole, for the benefit of all parties. Plaintiffs' Counsel obtained a ruling before this Court in *Harper v. O'Neal* denying the defendants' motion to dismiss the claims that the Astrals NFTs sold by the defendants (that are in fact purchasable on OpenSea) were unregistered securities under the *Howey* Test. Counsel have a well-equipped team of experts with great experience and background in helping the Court make these important decisions.  Without this procedure, most (if not all) of the proposed injured class members would have no available and possible avenue for possible relief.

**FACTUAL ALLEGATIONS**

1.      "[P]roud to be the first and largest marketplace for NFTs,"[2] Ozone Networks, Inc. (d/b/a/ OpenSea) was founded in 2017 by Devin Finzer and Alex Atallah. With its strong and "up and coming" reputation, OpenSea's customers understandably placed a great amount of trust in the

---

[2] https://opensea.io/about (accessed Sep. 19, 2024).

Company. After all, OpenSea owns and operates the largest peer-to-peer digital marketplace by volume, sales, and number of traders for cryptocurrency collectibles and non-fungible tokens ("NFTs").[3]



2.      NFTs are unique cryptographic tokens that exist on a blockchain—the digital database supporting cryptocurrencies—and cannot be replicated. NFTs permit investors to tokenize and secure ownership over a unique digital asset. NFTs are a unique asset that can be tied to some amount of monetary value, and investors bet on the value of the team or project and their work increasing in value over time, such that the NFT can be sold for a profit.

3.      A novel form of security, Finzer's X post below shows that Finzer acknowledged there is much unknown about NFTs. Indeed, Finzer admitted in 2021 that NFTs are not without their issues:

---

[3]      https://dappradar.com/rankings/nft/marketplaces?range=all&sort=tradersCount&order=desc (accessed Sep. 19, 2024).



4.      OpenSea is best described as a platform or exchange that supports trading through a variety of blockchains including Ethereum, Polygon, Solana, Arbitrum, Optimism, Klaytn, Avalanche, Zora, Base, Blast and Sei.[4]

5.      Ethereum is a decentralized blockchain that establishes a peer-to-peer network that securely executes and verifies application code, called "smart contracts." These smart contracts allow participants to "tokenize" things like art, collectibles, and even real estate. Ownership of an asset is secured by the Ethereum blockchain, meaning that no one can modify the record of ownership, or copy and paste a new duplicate NFT into existence.

6.      OpenSea has experienced great success. OpenSea has been described as having "plenty of runway" with respect to its financial success.[5] Indeed, in March 2021, OpenSea's revenue increased from $9 million in the second quarter of 2021 to $186 million in the fourth quarter of 2021.[6] In November 2023, "[i]t had $438 million in cash and $45 million in crypto reserves."[7]

7.      A former employee explained that "everybody saw a chance to become filthy rich" and that "celebrities [were] coming out of the woodwork, the cash grabs, [they were] just really exciting."[8]

---

[4] https://support.opensea.io/en/articles/8867082-which-blockchains-are-compatible-with-opensea (accessed Sep. 19, 2024).
[5] https://www.theverge.com/24161573/opensea-crypto-nfts-workplace-rise-fall (accessed Sep. 19, 2024).
[6] Id.
[7] Id.
[8] Id.

8.      OpenSea partnered with brands attempting to cash in on the NFT craze. For example, in September 2022, OpenSea partnered with Warner Music Group, a publicly traded company, to "provide a platform for select WMG artists to build and extend their fan communities in Web3." In 2024, OpenSea partnered with Coachella music festival to launch Coachella's NFT collection. These partnerships were critical for OpenSea in luring in investors.

9.      But after a series of poor, unethical business decisions (including putting most of its cash reserves into Ethereum, a popular type of cryptocurrency, without any diversification to "put its money where its mouth was") OpenSea's turbulence began—It reported a "net loss of $170.7 million in the second quarter of 2022."[9] In September 2021, OpenSea's head of product was pushed out due to insider trading.[10] Unbeknownst to OpenSea's customers, their trust in the Company to make intelligent investment decisions was unfounded.

10.     Amidst OpenSea's net loss of $170.7 million in the second quarter of 2022, one of OpenSea's former employees even pondered, "What the f***, you're not somebody's personal investor.[11] Why are you gambling on this when we have so much more upside."

11.     Faced with increasing competition, OpenSea, desperate to stay on its feet, continued to consciously "cater to speculators."[12]



---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

4

12.     Customers were often confronted with "NFT collections that were either spam or deliberately fraudulent, and stolen NFTs."[13] Internally and externally, the goodwill of OpenSea continued to dwindle into the abyss. It became a "dumpster fire" as "[m]orale just got really weird really quickly."[14]

13.     Despite OpenSea being a leader in the NFT industry, in an attempt to fade out of the spotlight, Atallah started to "distance[] himself from the startup."[15] At NFT.NYC, an annual NFT event, Finzer "was nowhere to be seen."[16] As the NFT market began to cool, OpenSea left its customers in the dark.

14.     OpenSea is no stranger to regulatory scrutiny. As the Securities Exchange Commission ("SEC") began to crack down on the NFT industry, OpenSea drew the Commissions attention.

15.     When the SEC took its first enforcement action in the NFT industry against the NFT project Impact Theory in late August of 2023 and weeks later against Stoner Cats 2 LLC in September of 2023, the SEC also issued third-party subpoenas to OpenSea for those projects.[17]

16.     Additionally, according to the technology magazine The Verge, "OpenSea also had a line attorney from the agency [the SEC] assigned to its 'case' and was engaged in 'custodial document production' with the agency, per internal company documents."[18]

17.     OpenSea's spokesperson, Galper, stated that these SEC requests had been occurring since 2022, and that they "cooperate with regulators and law enforcement as part of our standard practice, and we are committed to complying with applicable laws and regulations."[19]

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

18.     Further, according to The Verge, OpenSea issued a vocabulary guide for the appropriate terminology to use when discussing NFTs and OpenSea. "Instead of saying 'buy, sell, or pay on OpenSea,' legal counsel told employees to say, 'purchase on the blockchain,' 'purchase using MoonPay' (a crypto payments company), or 'buy using OpenSea.' The guide said, 'This distinction is very important to keep clear, as it impacts our tax and legal obligations.'"

19.     OpenSea's illegality is most recently seen by the Wells Notice issued by the Securities & Exchange Commission. While Finzer continues to double down on OpenSea's deceptive operations by remaining confident that OpenSea is not violating any securities laws, the Wells Notice suggests that OpenSea is in the hot seat and may be found liable for facilitating the exchange of unregistered securities.



20.     Failing to take accountability for facilitating the exchange of unregistered securities, Finzer instead supported the mocking of the SEC's Wells Notice and will continue to facilitate the sale of such securities to unsuspecting investors.



21.     Finzer also posted an official blog discussing OpenSea's receipt of the Wells Notice.[20]

22.     In the blog, Finzer wrote, "For those who haven't been closely following recent SEC moves, your reaction may be one of surprise: what do NFTs—collectibles, digital art, game items, and event tickets, among other uses—possibly have to do with securities law?" He then goes on to discuss the impact of the SEC's regulation on artistic expression.

23.     But, conveniently, Finzer does not mention how NFTs are sold as investments into others' entrepreneurial and managerial efforts—in his words, the "other uses"—which the SEC has clearly shown should be treated as securities, as discussed in the following section.

**PARTIES**

24.     Plaintiff Shnayderman is a citizen and resident of the state of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shnayderman invested with OpenSea and suffered investment losses because of Defendant's conduct.

---

[20] https://opensea.io/blog/articles/taking-a-stand-for-a-better-internet (accessed Sep. 19, 2024).

25.     Plaintiff Bronshtein is a citizen and resident of the state of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Bronshtein invested with OpenSea and suffered investment losses because of Defendant's conduct.

26.     Defendant OpenSea is "the first and largest marketplace for NFTs." OpenSea has its principal place of business in New York, New York, but has a national reach.

### JURISDICTION AND VENUE

27.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

28.     This Court has personal jurisdiction over Defendant, pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6), because Defendant conducts substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendant operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, engaging in a civil conspiracy with residents of the state, and causing injury to property in this state arising out of Defendant's acts and omissions outside this state; and at or about the time of such injuries Defendant was engaged in solicitation or service activities within this state, or products that Defendant promoted, sold, and offered for sale in this state were used or consumed within this state in the ordinary course of commerce, trade, or use.

29.     Additionally, Defendant has intentionally availed itself of the Florida consumer market through the targeted promotion, marketing, and sale of NFTs on its platform, OpenSea, in Florida, which constitutes committing a tortious act within the state of Florida. Defendant has registered as a foreign profit corporation with the state of Florida. Defendant has also marketed and participated and/or assisted in the sale of unregistered securities to consumers in Florida, in

violation of section 517.07 *et seq*. Defendant has also violated Florida's consumer protection statute, section 501.201 *et seq*.

30.     OpenSea has specifically targeted Plaintiffs and other Miami, Florida investors with advertisements, promotional events, and partnerships.

31.     For example, OpenSea partnered with the NFT project "The Doodles" to create "Doodle Putt," a mini-golf advertising event in the Miami neighborhood of Wynwood during 2022 Miami Art Week.[21]



---

[21] https://www.instagram.com/p/CmZa_5fj5Mv/ (accessed Sep. 19, 2024).

32.     Further, in July 2021, OpenSea partnered with the Miami Heat to launch one-hundred twenty-seven digital memorabilia NFTs to celebrate the fifteenth anniversary of the 2006 NBA championship victory.[22]

33.     Next, in December 2021, OpenSea collaborated with Christie's, the auction house, to curate an on-chain auction hosted on OpenSea.[23] As part of the collaboration, selected works from the collaboration were on exhibition during Art Basel Miami Beach.[24]

34.     Also in December 2021, the OpenSea team went to Miami and "partnered with some of the most exciting galleries, curators, and creators around to make sure NFTs are front and center as the art world makes a beeline for the Magic City."[25]

35.     Finally, OpenSea CEO Devin Finzer currently resides in Miami Beach, Florida,[26] where as recently as August 18, 2024, OpenSea posted job listings requesting applications for a full-time position in Miami for a "Personal Assistant to the CEO."[27]

36.     This Court's exercise of jurisdiction over Defendant for the claims asserted in this action comports with traditional notions of fair play and substantial justice.

37.     Venue is proper in this District under 28 U.S.C. § 1391 because OpenSea conducts substantial business in this District: class members either reside or did business with OpenSea in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred

---

[22]   https://www.nba.com/heat/news/heat-to-launch-official-commemorative-nft-collection-titled-15-strong (accessed Sep. 19, 2024).
[23]   https://press.christies.com/christies-announces-collaboration-with-opensea-the-worlds-leading-nft-marketplace (accessed Sep. 19, 2024).
[24]   *Id.*
[25]   https://opensea.io/blog/articles/team-opensea-heads-to-miami (accessed Sep. 19, 2024).
[26]   https://www.linkedin.com/in/dfinzer/ (accessed Sep. 19, 2024).
[27] https://a16zcrypto.com/jobs/companies/opensea/ (accessed Sep. 19, 2024); https://jobs.ashbyhq.com/OpenSea/4b7e00fd-cf9e-4d3a-a4c4-6597dd3f7dc1 (accessed Sep. 19, 2024); https://www.crypto-careers.com/jobs/338643203-personal-assistant-to-the-ceo-at-opensea (accessed Sep. 19, 2024).

in this District; and because OpenSea received substantial profits from class members who reside in this District. Venue is further proper pursuant to 15 U.S.C. § 78aa.

38.    All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## THE SEC'S CONSISTENT APPROACH TO CRYPTOCURRENCY

### Overview

39.    Despite the crypto industry's complaints about a lack of "regulatory clarity," the SEC's stance on cryptocurrency has always been consistent. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing. Clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

40.    Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

> The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities

11

Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment.[28]

41.     Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

> We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.[29]

42.     Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is consistently considered and affirmed, in the same way it has by hundreds of federal courts across the country since the *Howey* Decision, which the Supreme Court adopted over 75 years ago.[30] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[31] The *Howey Test* is the principal method used by the SEC to determine if a given cryptocurrency is a security.

43.     The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products

---

[28]  *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990) (emphasis added).
[29] *Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 14 n.7 (1971) (quoting A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2d Cir. 1967)).
[30] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).
[31] *Id.*

and services over the past decade. The SEC first made investors aware of the dangers of investing in digital assets in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[32]

44.     A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[33] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[34]

45.     The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[35]

46.     In 2019, the SEC released a "Framework for 'Investment Contract' Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[36]

---

[32] https://www.sec.gov/investor/alerts/ia_virtualcurrencies.pdf (accessed Sep. 19, 2024).
[33]         https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-39 (accessed Sep. 19, 2024).
[34] https://www.sec.gov/files/litigation/investreport/34-81207.pdf (accessed Sep. 19, 2024).
[35] *Id.*
[36]         https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets (accessed Sep. 19, 2024).

47.     In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[37] multiple speeches,[38] Congressional testimony,[39] and several official SEC statements [40] and proclamations.[41] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[42] warning that their failure to register with the SEC may violate U.S. securities laws.[43] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . **When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that**.[44]

48.     On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[45] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[46] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency

---

[37] https://www.sec.gov/securities-topics/crypto-assets  (accessed Sep. 19, 2024).

[38] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed Sep. 19, 2024).

[39] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed Sep. 19, 2024).

[40] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11  (accessed Sep. 19, 2024).

[41] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed Sep. 19, 2024).

[42] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec  (accessed Sep. 19, 2024).

[43] https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed Sep. 19, 2024).

[44] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec  (accessed Sep. 19, 2024).

[45] https://www.sec.gov/newsroom/speeches-statements/gensler-sec-speaks-090822#_ftnref3 (accessed Sep. 19, 2024).

[46] *Id.*

"through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[47]

49.     The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[48]

50.     What follows are summaries of cases that will help inform this litigation.

**SEC v. KIK**

51.     In *Kik*[49], the SEC's complaint[50], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[51]

52.     The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

**SEC v. Telegram**

---

[47] *Id.*

[48] https://www.cornerstone.com/wp-content/uploads/2022/01/SEC-Cryptocurrency-Enforcement-2021-Update.pdf  (accessed Sep. 19, 2024).

[49] https://www.sec.gov/news/press-release/2020-262  (accessed Sep. 19, 2024).

[50] https://www.sec.gov/news/press-release/2019-87  (accessed Sep. 19, 2024).

[51]      https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/  (accessed Sep. 19, 2024).

53.     In *Telegram*,[52] the SEC filed a complaint[53] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

54.     Telegram argued[54] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

55.     On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[55] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

56.     Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams.

---

[52] https://www.sec.gov/news/press-release/2020-146  (accessed Sep. 19, 2024).

[53] https://www.sec.gov/news/press-release/2019-212  (accessed Sep. 19, 2024).

[54]     https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/  (accessed Sep. 19, 2024).

[55]     https://www.gtlaw.com/en/insights/2020/4/sec-v-telegram--a-groundbreaking-decision-in-cryptocurrency-enforcement  (accessed Sep. 19, 2024).

It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

**SEC v. BlockFi**

57.     In *BlockFi Lending LLC*,[56] the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi[57] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

58.     BlockFi argued for "increased regulatory clarity" but lost. [58]

59.     To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

**SEC v. Terraform Labs Pte. Ltd.**

60.     In *SEC v. Terraform Labs PTE, Ltd. and Do Hyeong Kwon*,[59] on July 31, 2023, Judge Jed Rakoff in the Southern District of New York entered an order denying a motion to dismiss claims that defendants, a crypto-assets company and its founder, were responsible for a multibillion-dollar fraud that involved the development, marketing, offer and sale of crypto-assets that the

---

[56] https://www.sec.gov/newsroom/press-releases/2022-26 (accessed Sep. 19, 2024).
[57] https://www.sec.gov/newsroom/press-releases/2022-26  (accessed Sep. 19, 2024).
[58] https://blockfi.com/pioneering-regulatory-clarity  (accessed Sep. 19, 2024).
[59]     https://www.sec.gov/enforcement-litigation/distributions-harmed-investors/sec-v-terraform-labs-pte-ltd-do-hyeong-kwon-no-23-cv-1346-jsr-sdny (accessed Sep. 19, 2024).

SEC alleged were unregistered securities. *SEC v. Terraform Labs Pte. Ltd., et al.*, No 1:23-cv-01346-JSR, ECF No. 51 (S.D.N.Y. July 31, 2023).[60]

61.     Judge Rakoff explicitly rejects a key component of his colleague, Judge Analisa Torres' reasoning in her order on cross-motions for summary judgment in *SEC v. Ripple Labs, Inc., et al.*, No. 1:20-cv-10832, ECF No. 874 (S.D.N.Y. July 13, 2023), which drew a distinction between crypto-assets sold directly by the issuer and on the secondary market.[61]

62.     Judge Jed Rakoff is a highly regarded jurist who is considered an expert in securities law and business law. In fact, Todd Baker, an attorney and Senior Fellow at the Richman Center for Business, Law & Public Policy at Columbia Business and Law Schools called Judge Rakoff, in a Financial Times article, the "[T]he most respected securities authority in the federal judiciary."[62]

63.     Judge Rakoff also explicitly rejects a key element of Judge Torres' analysis in the Ripple decision, stating:

> It may also be mentioned that the Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not. In doing so, the Court rejects the approach recently adopted by another judge of this District in a similar case, *SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).[63]

---

[60] https://storage.courtlistener.com/recap/gov.uscourts.nysd.594150/gov.uscourts.nysd.594150.51.0_1.pdf  (accessed Sep. 19, 2024).
[61] https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rVqyLFyEZnz8/v0 (accessed Sep. 19, 2024).
[62] https://www.ft.com/content/5e5a3c4a-7508-4db8-ab23-1ff17c87c880 (accessed Sep. 19, 2024).
[63] https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rwwEEo0YbENc/v0  at 40  (accessed Sep. 19, 2024).

64.    Judge Rakoff goes on to explain that Howey and its progeny never made such a distinction, nor does it matter, for purposes of Howey analysis, whether a purchaser "bought the coins directly from the defendants or, instead, in a secondary resale transaction."[64]

**SEC v. Coinbase**

65.    In *Coinbase*,[65] on June 6, 2023 the SEC charged Coinbase[66] with "operating its crypto asset trading platform as an unregistered national securities exchange, broker, and clearing agency" and "failing to register the offer and sale of its crypto asset staking-as-a-service program."

66.    Since then, the Honorable Katherine Polk Failla of the Southern District of New York denied the Coinbase defendants' motion for judgment on the pleadings with respect to all but one claim, finding "the SEC has sufficiently pleaded that Coinbase operates as an exchange, as a broker, and as a clearing agency under the federal securities laws, and, through its Staking Program, engages in the unregistered offer and sale of securities." *SEC v. Coinbase, Inc., et. al.*, 23 Civ. 4738 (KPF), ECF No. 105 (S.D.N.Y. Mar. 27, 2024) at 84. [67]

67.    Judge Failla also found that the SEC had pleaded "control person liability" for Coinbase Global. *Id.*

**SEC v. Stoner Cats 2 LLC**

---

[64] *Id.* at 41.
[65] https://www.sec.gov/newsroom/press-releases/2023-102 (accessed Sep. 19, 2024).
[66] https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-102.pdf (accessed Sep. 19, 2024).
[67] Judge Failla only granted the motion as to the SEC's claim that Coinbase acted as an unregistered broker through its "Coinbase Wallet" service. *Id.* at 78, 84.

68.     In *Stoner Cats*,[68] the SEC filed a complaint[69] on September 13, 2023 and eventually settled with Stoner Cats 2 LLC for conducting an unregistered offering of securities in the form of NFTs called Stoner Cats. In the press release announcing the charges against Stoner Cats 2 LLC (SC2), Gurbir S. Grewal, Director of the SEC's Division of Enforcement, stated: "Regardless of whether your offering involves beavers, chinchillas or animal-based NFTs, under the federal securities laws, it's the economic reality of the offering – not the labels you put on it or the underlying objects – that guides the determination of what's an investment contract and therefore a security."

69.     In their order, the SEC highlighted several aspects of the Stoner Cats offering that revealed "[I]nvestors in Stoner Cats NFTs had a reasonable expectation of obtaining a profit based on SC2's [the issuer] managerial and entrepreneurial efforts."

70.     First, there was a secondary market for Stoner Cats holders to trade and profit off their NFTs. "In addition, at least 20% of the Stoner Cats NFTs purchased in the offering were resold in the secondary market before the first episode of the Stoner Cats series aired, two days after the offering, and the majority of the NFTs purchased in the offering were resold in the secondary market before the release of the second episode on November 15, 2021."

71.     Second, Stoner Cat NFT "owners" did not actually control the intellectual property associated with Stoner Cats. "While purchasers may 'own' their particular Stoner Cats NFT, SC2 specifically reserved all commercial rights to the underlying intellectual property, including the images of the characters. SC2 hired a contractor to write computer code that produced these unique images from animations created by the primary animator."

---

[68] https://www.sec.gov/newsroom/press-releases/2023-178 (accessed Sep. 19, 2024).
[69] https://www.sec.gov/files/litigation/admin/2023/33-11233.pdf (accessed Sep. 19, 2024).

72.    Third, secondary market re-sales of Stoner Cats generated royalties for Stoner Cats 2 LLC. The SEC alleged that "SC2 configured the Stoner Cats NFTs so that it received a 2.5% royalty for each transaction in them on a certain secondary market platform. The royalties created incentives for SC2 to encourage individuals to buy and sell the Stoner Cats NFTs in the secondary market." As well as that "[p]rior to the offering, one of the programmers working for SC2 contacted a platform for trading NFTs to 'verify' the Stoner Cats NFT collection. Doing so ensured that SC2 would receive royalties from resale transactions and, importantly, assured purchasers in the secondary market that they were buying authentic Stoner Cats NFTs. This facilitated secondary market transactions in Stoner Cats NFTs."

73.    While not listed in the complaint, media reports suggest that the platform was OpenSea.[70]

74.    OpenSea had Stoner Cats for sale on their platform.[71]

75.    Fourth, Stoner Cats 2 LLC used social media to promote the profit potential of Stoner Cats NFTs.

**SEC v. Impact Theory**

76.    In *Impact Theory*,[72] the SEC filed a complaint[73] on August 28, 2023, where the SEC charged, and subsequently settled with, Impact Theory, for conducting an unregistered offering of securities in the form of NFTs. The SEC alleged that the three tiers of NFTs offered and sold by the company, known as KeyNFTs, were unregistered investment contracts, per *Howey*. Therefore, the SEC alleged that "purchasers in the KeyNFT offering had a reasonable expectation of obtaining a future profit based on Impact Theory's managerial and entrepreneurial efforts."

---

[70]    https://www.ccn.com/news/stoner-cats-taken-down-on-opensea-rarible-after-sec-probe-sparking-controversy/ (accessed Sep. 19, 2024).
[71]    https://opensea.io/collection/stoner-cats-official/activity?tab=items (accessed Sep. 19, 2024).
[72]    https://www.sec.gov/newsroom/press-releases/2023-163 (accessed Sep. 19, 2024).
[73]    https://www.sec.gov/files/litigation/admin/2023/33-11226.pdf (accessed Sep. 19, 2024).

77.     Among other factors, the SEC noted that Investors could realize their profit from selling their NFTs on the secondary market. KeyNFTs could be traded on secondary trading platforms and the company promoted this fact. "Impact Theory stated on its websites and social media channels that KeyNFTs could be purchased and sold on two such secondary market platforms. Impact Theory programmed the smart contract for the KeyNFTs so that the company received a 10% 'royalty' on each secondary market sale."

78.     OpenSea had ImpactTheory NFTs for sale on their platform.[74]

**SEC v. Payward Ventures, Inc.**

79.     In *Payward Ventures, Inc.*[75] on November 20, 2023 the SEC filed a complaint[76] charging "Payward Inc. and Payward Ventures Inc., together known as Kraken, with operating Kraken's crypto trading platform as an unregistered securities exchange, broker, dealer, and clearing agency."

80.     In the recent order by the Honorable William H. Orrick of the Northern District of California denying Kraken's motion to dismiss the SEC's Complaint (ECF No. 90 S.D. Fla. Aug 23, 2024), Judge Orrick found that the SEC plausibly alleged Kraken offered or sold crypto assets on Kraken as investment contracts, which were therefore plausibly alleged to be unregistered securities.[77]

---

[74] https://opensea.io/collection/impact-theory-founders-key/analytics (accessed Sep. 19, 2024).
[75] https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25896 (accessed Sep. 19, 2024).
[76] https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-237.pdf (accessed Sep. 19, 2024).
[77] Motion to Dismiss Order at 27.

81.     In doing so, the court rejected, as other courts have, Kraken's argument that an investment contract requires "post-sale obligations" from the issuer to the purchaser who bought the token on a secondary marketplace, like Kraken.[78]

82.     The court was clear that investment contracts are not limited to actual contracts and that the Howey test applies regardless of whether that transaction is on a primary or secondary market.[79]

83.     Additionally, Judge Orrick agreed with previous courts, including Judge Rakoff in Terraform, that there is a distinction between the digital assets themselves and the offers to sell them.[80]

84.     Further, the court found the SEC to have plausibly alleged vertical commonality, and thus common enterprise, because the promoters of some crypto assets on Kraken allegedly retain ownership or control over billions of the tokens they promote.[81]

## RECENT FEDERAL CASE LAW ON CRYPTOCURRENCY

### DUFOE v. DRAFT KINGS INC.

85.     In *Dufoe v. Draftkings, Inc et al.*, a proposed class action in the United States District Court for the District of Massachusetts, plaintiff Justin Defoe alleges that DraftKings violated federal securities law by selling unregistered securities in the form of NFTs on the DraftKings Marketplace.[82]

---

[78] *Id.* at 13.
[79] *Id.* at 16-18.
[80] *Id.* at 14.
[81] *Id.* at 23
[82] Dufoe v. DraftKings Inc., 23-CV-10524-DJC, 2024 WL 3278637 (D. Mass. July 2, 2024).

86.     On July 2, 2024, the Honorable Denise J. Casper denied defendants' motion to dismiss. Judge Casper found that the plaintiff had "plausibly pled that DraftKings NFTs were investment contracts, and thus securities within the meaning of the Securities Act and Exchange Act."[83]

87.     Judge Casper found that Dufoe had sufficiently alleged horizontal commonality, therefore satisfying the common enterprise prong of *Howey*, because pooling occurred when the "revenue generated by the sale of NFTs was reinvested into DraftKings' business, including through promotion of the Marketplace."[84] Judge Casper also analogized to the court's holding in *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422 (S.D.N.Y. 2023) that DraftKings' control of the Marketplace was essential.

88.     Next, the court found that Dufoe had plausibly alleged the reasonable expectation of profits from his NFT purchase through the theory of capital appreciation in that "the value of existing NFTs is driven upwards if DraftKings maintains investor interest and demand in the Marketplace."[85]

89.     Finally, the court found that Dufoe had plausibly alleged that the profits were expected solely from the efforts of others because the NFTs values were dependent on the success of the DraftKings Marketplace, even though the NFTs were not minted on DraftKing's proprietary blockchain.[86]

90.     DraftKings NFTs are for sale on OpenSea's platform.[87]

**HARPER v. O'NEAL**

---

[83] Dufoe v. DraftKings Inc., 23-CV-10524-DJC, 2024 WL 3278637, at *10 (D. Mass. July 2, 2024)
[84] *Id.* at *5.
[85] *Id.* at *7.
[86] *Id.* at *9.
[87] https://opensea.io/collection/draftkings-reignmakers-football/activity (accessed Sep. 19, 2024).

91.     In *Harper v. O'Neal*,[88] the plaintiffs filed a class action suit in the United States District Court for the Southern District of Florida, against Shaquille O'Neal, Astrals LLC, Astrals Holding, LLC, and Astrals Operations LLC for their promotion, offer, and sale of unregistered securities in the form of Astrals NFTs and Galaxy tokens created by the Astrals project in violation of Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e(a) and 77o.

92.     Recently, on August 16, 2024, the Honorable Federico A. Moreno denied defendants' motion to dismiss claims that the Astrals NFTs constituted securities under the *Howey* test and applicable securities law and that Defendant O'Neal was a statutory seller engaged in the solicitation of sales of those unregistered securities.[89]

## OPENSEA'S NFTS ARE UNREGISTERED SECURITIES

93.     Under the *Howey* Test, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

94.     Applying the *Howey* Test to the NFTs on OpenSea reveals they qualify as securities as investment contracts:

### a.  An investment of money

95.     Investors purchasing NFTs on OpenSea made an investment of money or other valuable consideration for the purposes of the *Howey* Test. As the SEC states in its Framework:[90] "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because

---

[88] *Harper v. O'Neal*, 1:23-cv-21912, (S.D. Fla.)
[89] *Harper v. O'Neal*, 23-21912-CIV, 2024 WL 3845444 (S.D. Fla. Aug. 16, 2024).
[90]         https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets (accessed Sep. 19, 2024).

the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

### b. In a common enterprise

96.     The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

97.     This is true of OpenSea's NFT investors. Investors who buy NFTs on OpenSea are passive participants in the enterprise, with the profits of each investor intertwined with the fate of the project. The fortunes of the OpenSea NFT investors, and the value of the OpenSea NFTs, are linked almost entirely to the success of the creator's promotional efforts and development of the NFT project. Accordingly, when investors purchase NFTs on OpenSea, they participate in a common enterprise.

### c.     With the expectation of profit

98.     In terms of "reasonable expectations of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."[91]

99.     In particular, the SEC's Framework identifies several factors to help assess whether the "reasonable expectation of profits" element is met:

> The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit.
> 1.     The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
>> a.     The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the

---

[91] *Id.*

> network, particularly if there is a secondary trading market that
> enables digital asset holders to resell their digital assets and realize
> gains.
>
> b.     This also can be the case where the digital asset gives the
> holder rights to dividends or distributions.
>
> 2.     The digital asset is transferable or traded on or through a secondary
> market or platform, or is expected to be in the future.
>
> 3.     Purchasers reasonably would expect that an AP's [Active
> Participant, or promoter] efforts will result in capital appreciation of the
> digital asset and therefore be able to earn a return on their purchase.
>
> 4.     The digital asset is offered broadly to potential purchasers as
> compared to being targeted to expected users of the goods or services or
> those who have a need for the functionality of the network.[92]

100.    Investors in NFTs on OpenSea are clearly expecting to profit through the appreciation of

their digital assets that could be sold and traded through the OpenSea marketplace because they

were purchased through OpenSea, a secondary market, and the investors expected the price of

their asset to increase and result in an increased return on their purchase where they could then

resell them on OpenSea's secondary market.

### d.     To be derived from the efforts of others

101.    The SEC Framework provides that

> the inquiry into whether a purchaser is relying on the efforts of others focuses on
> two key issues: Does the purchaser reasonably expect to rely on the efforts of an
> [Active Participant]? Are those efforts 'the undeniably significant ones, those
> essential managerial efforts which affect the failure or success of the enterprise,' as
> opposed to efforts that are more ministerial in nature?
>
> Although no one of the following characteristics is necessarily determinative, the
> stronger their presence, the more likely it is that a purchaser of a digital asset is
> relying on the "efforts of others":
>
> 1.     An AP is responsible for the development, improvement (or
> enhancement), operation, or promotion of the network, particularly if
> purchasers of the digital asset expect an AP to be performing or overseeing
> tasks that are necessary for the network or digital asset to achieve or retain
> its intended purpose or functionality.
>
> a.     Where the network or the digital asset is still in development
> and the network or digital asset is not fully functional at the time of
> the offer or sale, purchasers would reasonably expect an AP to
> further develop the functionality of the network or digital asset

---

[92] *Id.*

(directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

2.      There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

3.      An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

4.      An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

5.      An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network . . .[93]

102.    Purchasers of NFTs on OpenSea are entirely reliant on the managerial efforts of the issuers for their potential profits. Indeed, the success of an NFT project's ability to maintain value depends significantly on OpenSea's strong reputation and promotional activities as well as the efforts of the NFT project creators to lead the development of the NFT project. This is due to the centralized nature of OpenSea unlike an investment in Bitcoin, for example, which is decentralized and run by no one other than the market.

103.    OpenSea created and supported the market for all NFTs on its platform.

104.    OpenSea had essential tasks or responsibilities, centralized into their company, where they were expected to engage in the moderation of the digital assets on its exchange, including moderation real-world financial instruments such as securities.

105.    The OpenSea NFTs were therefore "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC.

---

[93] *Id.*

## RELEVANT FACTUAL ALLEGATIONS

106.    In 2017, Devin Finzer and Alex Atallah launched OpenSea, an exchange with "tools that allow consumers to trade their items freely, creators to launch new digital works, and developers to build rich, integrated marketplaces for their digital items." [94]

107.    OpenSea based its domestic operations in New York, New York, where it created its headquarters.

108.    OpenSea is accessible throughout the United States and has sold NFTs to consumers nationwide.

109.    OpenSea's monthly active user count, defined as registered users who have made at least one transaction on OpenSea, was 123,358 users for the month of August, 2024. The amount of monthly active users has varied widely, but reached an all time high of 711,507 users for January, 2022. [95]

110.    In August, 2024, 788,393 NFTs were sold on OpenSea which generated the platform $837,185.40 in fees. In January, 2022, OpenSea reached 5,203,092 NFTs sold, an all time high number, which generated OpenSea  $123,114,953.65 of fees, also an all time high. [96]

111.    OpenSea facilitates the primary sale of NFTs through features such as OpenSea Studio tools[97] or smart contract deployment. [98]

112.    OpenSea facilitates the secondary sale of NFTs through its "Buy now," "Offers," and "Auctions" options. [99]

---

[94] https://opensea.io/about (accessed Sep. 19, 2024).
[95] https://dune.com/rchen8/opensea (accessed Sep. 19, 2024).
[96] Id.
[97] https://support.opensea.io/en/articles/8867023-how-do-i-create-an-nft (accessed Sep. 19, 2024).
[98]  https://support.opensea.io/en/articles/8867045-part-1-deploy-a-smart-contract (accessed Sep. 19, 2024).
[99] https://opensea.io/learn/nft/how-to-buy-nft (accessed Sep. 19, 2024).

113.    OpenSea receives a 2.5% fee on secondary sales and between a 2.5% and 10% fee on mints. If the listing or offer was created using OpenSea Pro, OpenSea receives a 0.5% fee.[100]

114.    OpenSea claims that it moderates the NFTs on its exchange, including "real-world financial instruments, such as loans, securities, or real estate."[101]

115.    Despite this, Plaintiffs purchased unregistered securities from OpenSea.

116.    Akin to cryptocurrency on other platforms, NFTs are treated like securities by OpenSea despite being unregistered with the SEC.

117.    OpenSea, in its role as the ringleader in the novel NFT space, continues to give false hope to unsuspecting investors by facilitating the exchange of unregistered securities, which are worthless.

118.    Plaintiff Shnayderman has accounts on OpenSea's website.

119.    Plaintiff Shnayderman purchased and still holds NFT projects, including but not limited to the following: (1) "Kith Friends," a partnership project between apparel brand Kith and NFT project Invisible Friends; (2) "Otherdeed for Otherside," a project by the Bored Apes Yacht Club featuring virtual land funding the development of the Otherside metaverse; (3) "Akutars," a project by former MLB player Micah Johnson; (4) "RTFKT SKIN VIAL: EVO X," which allows owners to customize their RTFKT x Nike Dunk CRYPTOKICKS shoes; (5) "Arcadeland," virtual land funding the development of the Arcadeverse metaverse; (6) "DystoApez," a project promising avatars and future benefits; (7) "Meta Angels NFT," a project promising a membership unlocking a network and benefits exclusively for the Meta Angels community; (8) "VaynerSports

---

[100] https://support.opensea.io/en/articles/8867091-what-fees-do-i-pay-on-opensea (accessed Sep. 19, 2024).
[101]              https://support.opensea.io/en/articles/9001072-an-introduction-to-content-moderation (accessed Sep. 19, 2024).

Pass VSP," promising ticket raffles, access to the VaynerSports agency, content with athletes, and future NFT collaboration access; (9) "Bobu, the Bean Farmer," a governance token to vote on how to develop the Bobu Intellectual Property; (10) "The Sandbox LANDs," virtual land funding the development of The Sandbox metaverse; (11) "Coolman's Universe," a project promising benefits exclusive for ownership of the collection; (12) "I Like You, You're Weird," a project to fund a tournament, an animated series, a party at Art Basel, and merchandise; (13) "Loser Club Official"; (14) "Dippies" a project which as of February 19, 2024 has promised partnerships, a VW Van Mobile Business, and business opportunities to operate Dippies Branded VW mobile businesses such as food and Beverage, Cannabis Accessories, Merchandise, and Holistic and Self-Healing; (15) "Dr. ETHvil's 3d FrankenPunks," a project promising owners the power to vote on creating experiences and influencing the project developments to be paid for by the project treasury; (16) "Critterz Plots," virtual land funding the development of a metaverse in the game Minecraft; (17) "tubby cats"; (18) "CLONE X - X TAKASHI MURAKAMI," a project of avatars for the metaverse, promising events, special access, and new collections; (18) "Floppy Collection," promising access to participation in NFT claims, raffles, giveaways, character and story development, game and series production, and world building; (19) "Killer GF," promising rewards, airdrops, charity auctions, mech, metaverse integrations, games, and expansions of the story; (20) "Lil' Heroes by Edgar Plans," funding the development of Lil' Heroes – The Series, an animated adventure comedy;  (21) "WVRPS by WarpSound (Official)"; (22) "Stoner Cats," a project funding an animated series; (23) "Bored Ape Yacht Club," promising benefits, and funding the development of other projects such as the Otherside metaverse; (24) "Mutant Ape Yacht Club," a project related to the Bored Ape Yacht Club, promising benefits and funding development of other projects; (25) "Rentalz Lambo," a project promising membership access to

exotic sports cars, and future projects such as real estate and yachts; (26) "Decentraland," virtual

lunding funding the development of the Decentraland metaverse; (27) "adidas Originals Into the

Metaverse"; (28) "adidas Originals Meta Capsule"; and (29) more projects than listed herein.

120.    Plaintiff Shnayderman bought and sold NFT projects for a loss, including but not limited

to "Pudgy Penguins," a project granting access to experiences, events, intellectual property

licensing and more.

121.    Plaintiff Bronshtein has an account on OpenSea's website.

122.    Plaintiff Bronshtein purchased and still holds NFT projects, including but not limited to

the following: (1) "Spooky Boys Country Club," a 501(c)(7) mutual benefit nonprofit corporation

promising access to benefits, and a game; (2) "OG Akutar Mint Pass" granting a "free" airdrop

to holders; (3) "Mutant Anatomy Science Ape Club"; (4) "Larva Chads"; (5) and "M Ape Kids

Club M1."

123.    Plaintiff Bronshtein bought and sold NFT projects for a loss, including but not limited to

"Mad Ape Tournament."

124.    All projects that Plaintiffs Shnayderman and Bronshtein purchased on their OpenSea

accounts, including but not limited to those delineated above, were and are unregistered securities,

as explained herein.

## CLASS ACTION ALLEGATIONS

125.   Plaintiffs Shnayderman and Bronshtein bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4) as the representative of Classes defined as follows:

**A.      Class Definitions.**

126.   Plaintiffs seek to represent the following Global and Nationwide Classes, and New York and Florida Subclasses (collectively, "the Classes"):

(1)   **Global Class:** All persons or entities who, within the applicable limitations period, purchased an NFT from OpenSea.

(2)   **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased an NFT from OpenSea.

(3)   **New York Subclass:** All persons or entities in the state of New York who, within the applicable limitations period, purchased an NFT from OpenSea.

(4)   **Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased an NFT from OpenSea.

127.   Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

**B.      Numerosity and Ascertainability**.

128.   Members of the Class are so numerous that joinder is impracticable. Plaintiffs Shnayderman and Bronshtein do not know the exact size of the Class but believe that there are many thousands of class members in the United States alone. As such, a class action is superior

to other methods of adjudication due to its capacity for efficiency and its preservation of judicial economy, more specifically. Membership in the class may be ascertained through records held by Class Members, for example, their own bank records, and/or records held by OpenSea.

     **C.**    **Typicality**.

129.   Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs Shnayderman and Bronshtein and all members of the Class were damaged by the same wrongful conduct of Defendant.

130.   Plaintiffs Shnayderman and Bronshtein will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving their own claims, Plaintiffs will prove other Class members' claims as well.

     **D.**    **Adequacy of Representation**.

131.   Plaintiffs Shnayderman and Bronshtein are represented by counsel who are experienced and competent in the prosecution of complex securities litigation on behalf of investors, including suits against third party aider/abettors to financial fraud. Plaintiffs Shnayderman and Bronshtein and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs Shnayderman and Bronshtein can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

     **E.**    **Commonality and Predominance**.

132.   There are questions of law and fact common to the Class that predominate over any questions of law or fact affecting the claims of individual Class Members, including, but not limited to:

(a)  whether non-fungible tokens sold on OpenSea were unregistered securities;

(b)  whether OpenSea's participation and/or actions in the offering and sales of non-fungible tokens violate the provisions of Florida securities law.

(c)  whether OpenSea's practices violate the UDAP statutes of New York and Florida;

(d)  whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(e)  whether Plaintiffs and Class members are entitled to injunctive relief;

(f)  whether Plaintiffs and Class members are entitled to declaratory relief; and

(g)  whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendant's conduct.

**F.      Superiority.**

133.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable, as Class Members are dispersed across the United States. Moreover, the claims of many Class Members does not exceed the cost of litigating the claims individually, and individual suits would not be cost effective or economically viable as individual actions.

**G.  Requirements of Rule 23(b)(2).**

134.   Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the NFTs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

### H. Requirements of Rule 23(c)(4).

135.    As it is clear that one of the predominant issues regarding Defendants' liability is whether the NFTs OpenSea offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

### CAUSES OF ACTION

### COUNT ONE
**Violations of the New York Deceptive Acts and Practices Unlawful Act N.Y. Gen. Bus. Law § 349**

136.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

137.    Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant.

138.    Plaintiffs Shnayderman and Bronshtein, both Florida residents who invested in NFTs, and who have been subjected to Defendant's scheme to mislead and deceive investors, assert this claim on behalf of the New York Subclass. Plaintiffs Shnayderman and Bronshtein were deceived by Defendant into believing that the facilitation of NFTs via OpenSea were registered securities.

139.    Defendant's acts and practices amount to acts, uses, or employment by Defendant and its agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in violation of New York General Business Law § 349, deeming deceptive and unfair acts and practices illegal.

140.    Defendant engaged in deceptive and unfair practices prohibited by New York General Business Law § 349 by, *inter alia*, misleading investors into believing that the NFTs in question are not registered securities as defined by the Securities and Exchange Act of 1934. Defendant took advantage of Plaintiffs' trust and confidence in OpenSea's brand and strong reputation by deceptively facilitating the sale of NFTs.

141.    Defendant's misleading promotion of NFTs as not being securities renders the sale of such NFTs unlawful.

142.    Defendant's statements that it moderates the NFTs on its' exchange, including "real-world financial instruments … securities"[102] and the listing of NFT projects on its website were deceptive and misled the Plaintiffs into purchasing worthless and unlawful unregistered securities.

143.    The unfair and deceptive trade acts and practices of Defendant are consumer oriented, are materially misleading, and have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and the other members of the New York Subclass.

144.    As a direct consequence of Defendant's unfair conduct and deception, Plaintiffs Shnayderman and Bronshtein and members of the New York Subclass have been damaged in that they spent money on NFTs that they would not have otherwise spent. In addition, Plaintiffs Shnayderman and Bronshtein and members of the New York Subclass did not receive a lasting value for the NFTs, and they are left in an adverse position due to the NFTs being unregistered with the Securites and Exchange Commission. Because of Defendant's misbranding in violation of New York General Business Law § 349, the NFTs are worthless.

---

[102]    https://support.opensea.io/en/articles/9001072-an-introduction-to-content-moderation (accessed Sep. 19, 2024).

## COUNT TWO
### Breach of Warranty

145.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs preceding Count One as if fully set forth herein.

146.    Plaintiffs allege that Defendant gave a valid and enforceable express warranty to each Plaintiff.

147.    When Plaintiffs, and all other OpenSea users, purchased NFTs, they entered into a contract with Defendant where Plaintiffs paid fees to Defendant in exchange for Defendant's promises that Plaintiffs will receive their NFT and that their NFT has value, and in exchange for an express warranty that the NFT is not an unregistered security.

148.    The contract contained an express warranty that the Plaintiffs' NFTs were not securities because OpenSea expressly warranted that it would moderate the OpenSea exchange for unregistered securities.[103]

149.    Defendant's terms of service expressly warranted that it is forbidden to "[u]se the Service to create, sell, or buy NFTs or other items that give owners rights to participate in an ICO or any securities offering, or that are redeemable for securities, commodities, or other financial instruments."[104]

150.    Under these express warranties, Defendant was obligated to ensure that the NFTs sold to its users were not unregistered securities.  In exchange, Plaintiffs and other users paid fees reasonably believing, relying on, and expecting that Defendant would remove unregistered securities from its exchange.

---

[103]         https://support.opensea.io/en/articles/9001072-an-introduction-to-content-moderation (accessed Sep. 19, 2024).
[104] https://opensea.io/tos (accessed Sep. 19, 2024).

151.    Defendant failed to moderate the OpenSea exchange for unregistered securities because Plaintiffs purchased unregistered securities on OpenSea. As a result, Defendant's express warranties were false statements of a material fact and Defendant breached its express warranty.

152.    Plaintiffs relied on these warranties to their detriment and unknowingly purchased worthless, illegal NFTs. In purchasing their NFTs, Plaintiffs reasonably believed and expected that Defendant would remove unregistered securities from its exchange.

153.    Whether the NFTs the Plaintiffs purchased were unregistered securities was a material fact because unregistered securities are illegal and therefore worthless.

154.    Instead of receiving NFTs free from defect, the Plaintiffs have received unregistered securities in exchange for their purchases, which due to their illegal nature are worthless.

155.    As a direct and proximate result of Defendant's breach of its express warranty, Plaintiffs have sustained damages as alleged herein.

156.    Plaintiffs are entitled to compensatory damages suffered because of this breach.

## COUNT THREE
**Violations of the Florida Statute Section 517.07, The Florida Securities and Investor Protection Act**

157.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs preceding Count One as if fully set forth herein.

158.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat. 305. Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the

purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

159.   The NFTs sold on OpenSea are a security pursuant to Fla. Stat. § 517.021(22)(a).

160.   The NFTs that were sold and offered for sale to Plaintiffs and Class members were not:

    a)   exempt from registration under Fla. Stat. § 517.051;

    b)   a federal covered security;

    c)   registered with the Office of Financial Regulations (OFR); or

    d)   sold in a transaction exempt under Fla. Stat. § 517.061.

161.   OpenSea sold and offered to sell the unregistered NFTs to Plaintiffs and the members of the Class.

162.   Defendant is a director, officer, partner and/or agent of OpenSea pursuant to Fla. Stat. § 517.211.

163.   Alternatively, Defendant OpenSea was a director, officer, partner, or agent of or for the secondary seller on OpenSea pursuant to Fla. Stat. § 517.211..

164.   OpenSea offered and sold the unregistered NFTs to Plaintiffs and the members of the Class. As a result of this assistance, Defendant violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT FOUR
### Violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, Florida Statutes, et seq.

165.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs preceding Count One as if fully set forth herein.

166.   This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., et seq. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of

competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

167.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat.

168.    Defendant is engaged in trade or commerce within the meaning of the FDUTPA.

169.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

170.    Defendant's unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

171.    Defendant has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

172.    Plaintiffs and consumers in the Classes have been aggrieved by Defendant's unfair and deceptive practices and acts of false advertising by relying on Defendant's false promises of moderation of its platform.

173.    The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

174.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

175.    Defendant still utilizes many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if Defendant continues to engage in such deceptive, unfair, and unreasonable practices. Section

501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to Defendant's unfair and deceptive scheme.

## COUNT FIVE
**Unjust Enrichment**

176.    Plaintiffs reallege and incorporate by reference the allegations contained in the paragraphs preceding Count One as if fully set forth herein.

177.    Plaintiffs directly conferred a monetary benefit on OpenSea in the form of fees paid for OpenSea's transaction services.

178.    Plaintiffs also conferred a monetary benefit on OpenSea because OpenSea accepted funds that it knew, or should have known, were derived from the sale of unregistered securities.

179.    With Plaintiffs' money, OpenSea enriched itself.

180.    OpenSea has knowledge of the benefits that Plaintiffs conferred on them.

181.    Under principles of equity and good conscience, Defendant should not be permitted to retain the funds and assets they received as a result of its misleading sale of unregistered securities to the unknowing Plaintiffs.

182.    As a result of Defendant's conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

183.    To the extent that Plaintiffs have no other adequate remedy at law, Plaintiffs seek restitution of all funds and assets that Defendant has unjustly received as a result of their conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

## JURY DEMAND

184.    Plaintiffs Shnayderman and Bronshtein demand trial by jury on all issues so triable.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** on behalf of themselves and those similarly situated, Plaintiffs Shnayderman and Bronshtein pray for judgment in its favor and against Defendant for compensatory damages, punitive damages, attorney's fees, and for all such other relief as this Court deems fair and just.

**Dated:**      **September 19, 2024**

Respectfully submitted,

**By: <u>/s/ Adam Moskowitz</u>**
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
Howard M. Bushman
Florida Bar No. 364230
**THE MOSKOWITZ LAW FIRM, PLLC**
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Telephone: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
howard@moskowitz-law.com